

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AFM:ADR  *271 Cadman Plaza East*
F. #2022R00177  *Brooklyn, New York 11201*

June 12, 2025

By ECF

The Honorable Eric R. Komitee
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:  United States v. Charles O. Parks III
     Criminal Docket No. 24-105 (EK)

Dear Judge Komitee:

The government respectfully submits this sentencing memorandum in advance of the defendant Charles Parks' sentencing hearing, which is currently scheduled for June 26, 2025. For the reasons set forth below, the government respectfully requests that the Court impose a sentence at the high end of the advisory United States Sentencing Guidelines ("Guidelines") range of 41 to 51 months' imprisonment. Such a sentence would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

I.  Background

A.  The Offense Conduct

The defendant's conduct is detailed in the indictment in this case and in the Probation Department's ("Probation's") Presentence Investigation Report, dated April 24, 2025 ("PSR"). From in or about January through August 2021 the defendant operated a large-scale "cryptojacking" operation in which he defrauded two well-known providers of cloud computing services out of more than $3.5 million worth of computing resources in order to mine nearly $1 million in cryptocurrency.[1]  The defendant deceived the providers into approving heightened

---

[1] Cryptocurrency mining is the process by which cryptocurrency transactions are verified and added to the public blockchain and also the means through which new cryptocurrency units are generated and released. Transactions are verified and assembled into "blocks" through the creation of codes, or "hashes," that fulfill certain requirements. The blocks are then appended to the blockchain. Those who carry out the task of verifying blocks of legitimate transactions, often referred to as "miners," are rewarded with an amount of that cryptocurrency. Mining operations often require and consume massive amounts of computing power and hardware—such

privileges and benefits, including elevated levels of computing services, and deflected inquiries from the providers regarding questionable data usage and mounting unpaid subscription balances. The defendant then converted and laundered the mining proceeds through cryptocurrency exchanges, a non-fungible token ("NFT") marketplace, an online payment provider, and traditional bank accounts, and structured money movements to avoid transaction reporting requirements under federal law. The defendant used the proceeds of the scheme to make extravagant purchases, including a Mercedes Benz car, jewelry and luxury hotel and travel expenditures.

i. The Defendant

The defendant is a would-be crypto influencer who goes by the moniker "CP3O." On his publicly available LinkedIn profile, the defendant has described himself as a "Professional. Media. Technology. Strategy. Consultant. . . . I help people generate more revenue for their business. Furthermore, I have created some technology that expedites that goal. I am interested in partnerships/joint venture opportunities that fairly and lucratively benefit all parties involved." PSR ¶ 5. The defendant has operated various corporate entities, including "MultiMillionaire LLC" and "CP3O LLC." He also previously promoted a cryptocurrency mining pool on his website, quorletha.cp3o.com, and claimed to have previously created and distributed his own cryptocurrency token known as "the cp3o Token." *Id.*

The defendant's "MultiMillionaire" YouTube channel, which boasts thousands of subscribers, features videos in which the defendant offers business advice and tips for success to his followers. A video published to the channel in June 2022, titled "MultiMillionaire Mentality (Introduction)," depicts luxury yachts, mansions, Ferraris and other trappings of extravagance before resolving to the defendant's stylized MultiMillionaire logo. *See* https://www.youtube.com/watch?v=oIbJmiQB-0E (last visited June 7, 2025). He has also sold MultiMillionaire merchandise on his website, including mugs and t-shirts.

ii. The Fraudulent Scheme

Between approximately January and August 2021, the defendant defrauded two cloud computing service providers ("Company-1"[2] and "Company-2") (collectively, the "Victim Companies") in order to operate a large-scale cryptomining operation. The defendant created and used fictitious personal identifying information, email addresses and corporate entities to register numerous accounts with the Victim Companies and gain access to immense amounts of computing processing and storage. *Id.* ¶ 19. In particular, the defendant registered five different accounts with Company-1 and multiple accounts with Company-2 using a variety of different names, corporate affiliations and other identifying information, including emails from MultiMillionaire LLC and CP3O LLC domains that he registered and controlled. *Id.* ¶ 25. The defendant also

---

that often, as here, the resources consumed by mining exceed the value of the cryptocurrency generated.

[2] The defendant interacted with a subsidiary of Company-1 that is referred to in the indictment and PSR as "Subsidiary-1." For ease of reference, this submission refers collectively to Company-1 and Subsidiary-1 as "Company-1."

utilized virtual private networks ("VPNs") or proxy services when registering and using the accounts. *Id.* Such services allow internet users to mask their true Internet Protocol ("IP") addresses, adding a layer of anonymity to their internet use.

The defendant tricked and defrauded the Victim Companies into approving heightened privileges and benefits, including elevated levels of cloud computing services and deferred billing accommodations, by misrepresenting how he intended to use the resources. *Id.* ¶ 26. For example, in multiple communications with Company-1, the defendant justified his requests for increases in service limits by stating that he was "building a global online training company that focuses on media, technology, and business strategy, with deep dives into business analytics, business intelligence, data science, and machine learning." He stated that his "ultimate goal [was] to be able to serve 10,000 students simultaneously." *Id.* ¶ 20.

This was a lie. There was no training company and there were no students. There was only the defendant's self-serving crypto-mining operation. The defendant knew that Company-1 and Company-2 never would have provided the services they did, nor agreed to the increases in service limits, had they known that the defendant was lying about his usage and actually using those services to mine cryptocurrency. *Id.* ¶ 33. This is because cryptocurrency mining is known to consume significant computer resources which results in unexpectedly high bills, and also creates security and network integrity concerns. Nor would they have continued to provide him services if they knew that he did not intend to pay for them. The defendant deceived the Victim Companies by creating multiple accounts with different identifying information and repeatedly opening new accounts. On two occasions, the defendant began using a new Company-1 account within one day of a prior account being suspended for nonpayment and fraudulent activity. *Id.* ¶ 27. Similarly, just days after Company-2 shut down accounts that he had used to steal hundreds of thousands of dollars worth of computing resources, the defendant created new accounts with Company-2 that he used to steal hundreds of thousands more in resources.

During the course of the scheme, the defendant repeatedly requested that Company-1 provide him access to powerful and expensive computing instances,[3] including graphics processing units that he used for his mining operation. The defendant launched tens of thousands of these instances to mine cryptocurrency, employing mining software applications to facilitate the mining of tokens including Ether ("ETH"), Litecoin ("LTC") and Monero ("XMR") in various mining pools, and employing tools that allowed him to maximize cloud computing power and monitor which instances were actively mining on each mining pool. *Id* ¶ 26.

In total, the defendant stole approximately $2,581,236.83 in Company-1's services and approximately $969,731.92 in Company-2's services, totaling over $3.5 million. *Id.* ¶ 27. Through that mining activity, the defendant acquired over $900,000 in cryptocurrency. *Id.* ¶ 21. The defendant later confirmed to law enforcement that he earned "just south of a million" dollars as a result of the operation. *Id.* ¶ 33.

---

[3] "Instance" is a computer science term that refers to the occurrence of any variable, data structure, function or method during the runtime of a computer program. Both Company-1 and Company-2 provide multiple types of instances as part of their cloud computing services.

### iii. The Laundering of Fraudulent Proceeds

The defendant used a variety of wallets, cryptocurrency exchanges, and an NFT marketplace to launder the mined cryptocurrency and convert it to U.S. dollars. *Id* ¶ 21. He then transferred the funds into various accounts in the name of CP3O LLC held at banks and financial institutions (including those referred to in the indictment and PSR as "Bank-1" and the "Online Payment Provider"). *Id*. ¶ 28. He also structured various money movements to avoid transaction reporting requirements under federal law, in particular the requirement that financial institutions file a Form 8300 with the Internal Revenue Service and report any transaction exceeding $10,000. *Id*. ¶ 29. For example, on or about February 5, 2021, the defendant exchanged amounts of LTC and ETH into $10,887 using a cryptocurrency exchange. Immediately thereafter, he transferred $9,999 from a wallet at the exchange to a CP3O LLC account held by the Online Payment Provider. Approximately one minute later, he transferred the remaining $888 from the same wallet to the same account at the Online Payment Provider. *Id*. ¶ 30.

Similarly, on or about February 8, 2021, the defendant exchanged an amount of ETH into $10,440 using a cryptocurrency exchange. Immediately thereafter, he transferred $9,999 from a wallet at the exchange to a CP3O LLC account held by the Online Payment Provider. Approximately one minute later, he transferred the remaining $441 from the same wallet to the same account at the Online Payment Provider. *Id*. ¶ 33. The following day, on or about February 9, 2021, the defendant exchanged an amount of ETH into $10,284 using a cryptocurrency exchange. Immediately thereafter, he transferred $9,999 from a wallet at the exchange to a CP3O LLC account held by the Online Payment Provider. He then transferred the remaining $285 from the same wallet to the same account at the Online Payment Provider. *Id*. ¶ 32. He executed this series of transactions in approximately two minutes. *Id.*

After converting the ill-gotten cryptocurrency into dollars, the defendant used the proceeds of the scheme to make extravagant purchases, including a Mercedes Benz S63 AMG car, jewelry and luxury hotel and travel expenses. The defendant also transferred the illicit funds from the cryptocurrency exchange and an account in the name of CP3O LLC held at the Online Payment Provider into at least four different accounts in the name of CP3O LLC held at Bank-1, inflating the value of those accounts. *Id.* ¶ 22. The defendant used the balances in Bank-1's CP3O LLC accounts to help secure a $75,000 small business loan. *Id.*

### iv. Boasting About the Fraud

The defendant boasted about his fraudulent profits and luxury purchases in order to earn credibility and followers as a crypto influencer. In a video uploaded in September 2022 to his "MultiMillionaire" YouTube channel, the defendant purported to share tips for achieving what he called a "MultiMillionaire Mentality." Describing the fraudulent scheme, he stated that, "Last year I set a goal for myself that I wanted to make seven digits or more, and so I spent the first ten days of the year creating a—we'll just call it a really nice crypto script, that I was able to use at scale. And after working that ten days, let's just put it this way, I didn't work the rest of the year." *Id*. ¶ 24; *see* https://www.youtube.com/watch?v=Rap0uMLHO3Q at 03:15-40 (last visited June 12, 2025). He later added that, "after I launched my crypto scripts, for the most part I traveled, I can't even tell you how many cities in the United States I hit last year, my biggest trip was to Puerto

Rico," and "by April, I purchased myself a Mercedes Benz AMG S class coup." *Id.* at 12:40-14:20.

  B. <u>The Charges and Guilty Plea</u>

  On April 15, 2024, an indictment was unsealed charging the defendant with wire fraud, in violation of 18 U.S.C. § 1343 (Count One); money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and (ii) (Counts Two and Three); and engaging in unlawful monetary transactions, in violation of 18 U.S.C. § 1957(a) (Counts Four through Six). *See* ECF No. 1. On December 5, 2024, the defendant pled guilty before United States Magistrate Judge Cheryl L. Pollak, pursuant to a plea agreement, to Count One of the indictment. PSR ¶ 1. This Court accepted the plea.

II. <u>Applicable Law</u>

  The Supreme Court has instructed that a district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007) (citation omitted).

  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." *Id.* at 50 (citation and footnote omitted). Title 18, United States Code, Section 3553(a) provides, in part, that in imposing a sentence, a court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
>
> (2) the need for the sentence imposed--
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct; [and]
>>
>> (C) to protect the public from further crimes of the defendant.

  Section 3553 also recognizes the need to afford the defendant opportunities for rehabilitation. *See* 18 U.S.C. § 3553(a)(2)(D). Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence. The sentencing court must also "remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6.

III.  Guidelines Calculation

The government agrees with Probation's calculation of the defendant's offense level in the PSR (¶¶ 37-48) as set forth below:

| | | |
|---|---|---:|
| | Base Offense Level (U.S.S.G. § 2B1.1(a)(1)) | 7 |
| Plus: | Loss Exceeds $3,500,000 (U.S.S.G. § 2B1.1(b)(1)(J)) | +18 |
| Plus: | Sophisticated Means (U.S.S.G. § 2B1.1(b)(10)(C)) | +2 |
| Less: | Acceptance of Responsibility (U.S.S.G. §§ 3E1.1(a), (b)) | -3 |
| Less: | Adjustment for Zero-Point Offenders (U.S.S.G. § 4C1.1) | -2 |
| | Total: | <u>22</u> |

The total offense level is 22, which, based on a Criminal History Category of I (*id.* ¶ 53), carries an advisory Guidelines range of 41 to 51 months' imprisonment.

IV.  The Defendant's Objections to the PSR

A.  Loss Amount

In his plea agreement, the defendant stipulated to the Guidelines estimate and waived any right to an evidentiary hearing at sentencing, except that he retained the right to challenge the loss amount. The defendant now generally disputes the loss amount calculated by the government and Probation but offers no alternative proposed amount that the Court could use at sentencing. *See* Defendant's Objections at 1-4, ECF No. 37 ("Def. Obj.").

Under the Guidelines, loss under Section 2B1.1(b)(1) for theft of resources is "[t]he fair market value of the property unlawfully taken." *See* U.S.S.G. § 2B1.1 Application Note 3(B)(i). The estimate of that loss "shall be based on available information," and a sentencing court "need only make a reasonable estimate of the loss." *Id.* at Application Note 3(B); *see United States v. Nachamie*, 28 F. App'x 13, 25 (2d Cir. 2001) ("The district court need only make a reasonable estimate of the loss, given the available information[.]") (quoting *United States v. Carboni*, 204 F.3d 39, 46 (2d Cir.2000)).

Here, there is ample evidence from each Victim Company of the costs (*i.e.*, the fair market value) of the expensive computing instances and cloud resources provided to the defendant. There is no other relevant analysis. *See also United States v. Granik*, 386 F.3d 404, 414 (2d Cir. 2004) (citing predecessor Guideline provision stating that loss is "the value of the money, property, or services unlawfully taken" and is based upon the "fair market value" of stolen property); *United States v. Larracuente*, 952 F.2d 672, 674 (2d Cir. 1992) (upholding loss calculation based on "normal retail price" of pirated movies); *United States v. Wasz*, 450 F.3d 720, 727 (7th Cir. 2006) ("[T]he price at which the retailers would have sold that merchandise serves as a reasonable estimate of the loss.") (collecting cases across circuits deciding same); *see also United States v. Hoffman*, 901 F.3d 523, 536 (5th Cir. 2018) (protected property includes both money in hand and

6

money due) (citing *Pasquantino v. United States*, 544 U.S. 349, 356 (2005)). Whether the losses are considered stolen resources or money due, the result is the same—the Victim Companies are out the money the defendant owed but never paid them.

The authority cited by the defendant does not dictate otherwise. The defendant is correct that the Guidelines advise that "if the fair market value is impracticable to determine or inadequately measures the harm, the cost to the victim of replacing that property" may be considered instead. U.S.S.G. § 2B1.1 Application Note 3(B)(i). However, the opposite is true here. The fair market value has already been determined, while the raw cost of providing the computing services is effectively impossible to measure. To assess the raw cost of providing each computing resource at issue over a period of months would require a sprawling analysis by each Victim Company of the costs associated with developing, building, maintaining, marketing and providing the at-issue computing resources, which is virtually impossible to do with any measure of precision or accuracy given the complex and evolving nature of these metrics, and the many subjective judgments that would be required to categorize, total and apportion costs. Moreover, such an exercise would be incredibly burdensome to conduct, and would reveal enormous quantities of proprietary company information, to no reliable end. The law as to loss amount does not necessitate such an endeavor, nor does it permit the defendant to demand it of his victims.

The cases the defendant cites directly undermine his arguments. In *United States v. Villa*, the Second Circuit affirmed the district court's decision to approximate loss using fair market value, not replacement value. *See* 744 F. App'x 716, 720-21 (2d Cir. 2018) ("[T]he district court [] concluded that although it recognized the methodology promoted by the government 'may not be the only methodology to be used,' it 'seems to reflect . . . fair market value.' [] The district court's decision was not clearly erroneous but rather was adequately supported by the record before it."). The Fifth Circuit reached the same result in *United States v. Lige*. *See* 635 F.3d 668, 669 (5th Cir. 2011) ("[The defendant] argues that the district court should have computed the 'intended loss' resulting from his scheme using the wholesale price of the phones—that is, Sprint and Nextel's replacement cost—rather than the full retail price of the phones. Because Sprint and Nextel offered these phones for sale in the retail market, we conclude that the retail price of the phones was the appropriate measure of the intended loss."). In *Lige,* the Fifth Circuit reasoned as follows:

> Lige contends that the economically realistic pecuniary impact on Sprint and Nextel is merely the wholesale value of the phones—the price at which Sprint and Nextel can purchase the phones. Using the retail value of the phones, he contends, would essentially include lost profits. However, Lige's argument ignores the fact that Sprint and Nextel are not in the business of selling phones at cost. They incur overhead costs and operating expenses beyond the wholesale cost of their merchandise, and are in business to make profits— profits that they did not receive on Lige's fraudulent orders.
>
> Moreover, a commonsense analysis confirms that the retail price is the appropriate measure of the economically realistic pecuniary impact on the victim. In this case, the harm suffered by Sprint and Nextel is the loss of the fraudulently ordered phones. The monetary

7

> value of that harm depends on what the phones were worth to the victim. Sprint and Nextel are sellers in the retail phone market. Consequently, taking a realistic, economic approach, they would value these assets based on the price at which they could sell them, not the price at which they obtained them. Thus, the fair market value is the retail price, which is a good measure of the harm inflicted on Sprint and Nextel by the loss of the merchandise.

*Id.* at 671. The same analysis applies here, where the Victim Companies had finite resources and cloud space to provide to customers, where those resources were expensive to provide, and where the Victim Companies were in the business of providing those resources for a profit.

To the extent that the defendant seeks to challenge the Victim Companies' own calculations of their retail cost of services, he has no basis to do so. Those figures were supported by extensive discovery provided to the defendant. As stated in the PSR, the defendant fraudulently stole $2,581,236.83 in Company-1's services and $969,731.92 in Company-2's services. PSR ¶ 27. On June 5, 2025, the government received and provided to Probation a sworn Affidavit of Loss from Company-1 indicating losses in this amount. The government understands that Company-2 intends to make a submission as well.[4]

Moreover, just because Company-2 credited back some of the costs, as companies often do when they are unable to collect outstanding debts from customers, that does not mean that the defendant did not incur the costs to begin with. The defendant offers no support—no sworn affidavit nor email communications by him nor any other evidence—for his assertion that those credits were provided because he disputed the validity of the costs and Company-2 agreed with his dispute. Indeed, the evidence the defendant does point to reflects repeated attempts by Company-2 to collect from the defendant. *See* Def. Obj. Ex. A (containing a selection of escalating past due payment demands on April 15, April 20, April 28, May 20 and August 2, 2021). As the defendant concedes, loss is "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b)(1), Note to Table (A).

The defendant also argues that he was a preexisting customer of both Company-1 and Company-2 and that he made some legitimate uses of their cloud computing services and paid for those services. *See* Def Obj. at 3. This is true but also beside the point. The government's loss calculation stems from the period of the defendant's fraudulent scheme, a period during which he made *no* payments to either Victim Company for the services he obtained. The loss calculation does not include the cost of services he paid for prior to the charged scheme.

---

[4] The defendant alludes to his "substantial effort" to compel the production of additional information from his victims. *See* Def. Obj. at 2. However, more than eight months have passed since the Court granted the defendant's request to serve subpoenas on the Victim Companies and there has been no attempt by the defendant to litigate compliance with them. In any event, as the government already discussed at length in its motion to quash the subpoenas, the information the defendant sought was either already provided to him, does not exist, or is irrelevant. *See* ECF No. 34 at 6.

Lastly, the defendant argues in the alternative that the Court should conclude that loss amount cannot reasonably be determined and should therefore be calculated using the defendant's gain. That is not proper here. Under the Guidelines, "The court shall use the gain that resulted from the offense as an alternative measure of loss *only* if there is a loss but it reasonably cannot be determined." U.S.S.G. § 2B1.1(b)(1), Note to Table (B) (emphasis added). That is not the case here, where loss amount can be—and has been—determined. Moreover, the defendant's proposed calculation of gain is incorrect. The government agreed to a forfeiture money judgement of $500,000 and forfeiture of the Mercedes Benz (which the defendant purchased for approximately $59,000) as part of a negotiated plea agreement to resolve the case short of trial. As alleged in the indictment and described in the PSR, the defendant in fact earned more than $900,000 from his cryptojacking operation. PSR ¶ 21. The defendant himself admitted to law enforcement that he earned "just south of a million" dollars as a result of the scheme. *Id.* ¶ 33.

B. <u>Departures/Variances</u>

The defendant does not identify any inaccuracies in Paragraph 110 of the PSR and it should therefore remain unchanged. The defendant's objections to this paragraph appear to consist of arguments already included in his sentencing submission, and the government responds to them below.

C. <u>Factual Corrections</u>

The government does not oppose the minor corrections suggested by the defendant in Paragraphs 21, 65, 66, 67, 68, 86 and 90 of the PSR.

V. <u>Forfeiture and Restitution</u>

The defendant has agreed to a forfeiture money judgment of $500,000 and has additionally agreed to forfeit all right, title and interest in the Mercedes Benz S63 AMG discussed above, which he purchased for approximately $59,000 using proceeds from his fraudulent scheme. *Id.* ¶ 105. On February 14, 2025, the Court entered an order of forfeiture reflecting these terms. *See* ECF No. 30.

As stated in the defendant's plea agreement, restitution is mandatory in the full amount of each victim's losses. PSR ¶ 107; *see* 18 U.S.C. §§ 3663A, 3664. The government respectfully requests that the Court impose restitution in the amount of $3,550,967, with $2,581,236 to be paid to Company-1 and $969,731 to be paid to Company-2.

Under the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A, "a sentencing court 'shall order, in addition to . . . any other penalty authorized by law,' defendants convicted of specified crimes to 'make restitution to the victim of the offense.'" *United States v. Gushlak*, 728 F.3d 184, 190 (2d Cir. 2013) (quoting 18 U.S.C. § 3663A(a)(1)). It is well-established that a court may impose restitution based upon a "reasonable approximation" of losses incurred to the victims. *Id.* at 195; *see also United States v. Germosen*, 139 F.3d 120, 129-30 (2d Cir. 1998). "The government bears the burden of proving the amount of loss sustained by the victim by a preponderance of the evidence." *United States v. Donaghy*, 570 F. Supp. 2d 411, 423 (E.D.N.Y. 2008), *aff'd sub nom. United States v. Battista*, 575 F.3d 226 (2d Cir. 2009) (citations omitted). Moreover, "[u]ncertainties with respect to the amount in question should be resolved in

9

favor of the victim in accord with the statutory focus on making the victim whole." *Donaghy*, 570 F. Supp. 2d at 423 (citations and quotation marks omitted). "Although estimates are appropriate, a court must base its restitution award on more than mere speculation about a victim's actual losses." *Id.*

The Second Circuit has explained that that the loss figure from the Guidelines may be appropriate although the "amount-of-loss calculation for purposes of sentencing does not always equal such a calculation for restitution." *Germosen*, 139 F.3d at 130. However, "the quantity and quality of evidence the district court may rely upon to determine the amount of loss is the same in both contexts." *Id.* In *Germosen*, the Court of Appeals held that the "reasonable estimate" used by the district court to calculate actual loss for purposes of the Sentencing Guidelines was equally appropriate to calculating restitution. *Id.* at 129-30. In *Gushlak*, the Court of Appeals explained that "[s]o long as the basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution. 728 F.3d at 196. "The use of victim loss affidavits in calculating restitution is widely accepted, even though 'production of such affidavits is not required under the statute.'" *United States v. Romano*, No. 09-CR-170 (EK)(VMS), 2022 WL 2666914, at *6 (E.D.N.Y. July 11, 2022), *aff'd*, No. 15-992, 2022 WL 17097587 (2d Cir. Nov. 22, 2022) (quoting *United States v. Hall*, 467 F. App'x 47, 49 (2d Cir. 2012)).

Here, the government has meticulously calculated the losses of each victim and obtained a sworn affidavit from Company-1 confirming its loss amount (as noted above, the government understands that Company-2 also intends to make a submission). The defendant has offered no alternative calculation and makes no objection or argument as to restitution in his sentencing submission. The Court should order restitution of $3,550,967.

VI. <u>A Guidelines Sentence Is Appropriate</u>

The government respectfully submits that a sentence at the high end of the advisory Guidelines range of 41 to 51 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing in this case. The need for such a sentence is underscored by the sentencing factors articulated in 18 U.S.C. § 3553(a), including the nature and circumstances of the offense and the need for deterrence.

The defendant's conduct was serious and elaborate. He orchestrated a complex fraud over a period of months that deceived even sophisticated companies, made almost $1 million in profits, and caused losses over $3.5 million. The defendant's scheme required near-constant deception—multiple accounts using different identifiers, the use of VPNs, and repeated material misrepresentations to the Victim Companies. To perpetuate his scheme, the defendant created and used multiple corporations and bank accounts to launder and conceal misappropriated funds. He then used the funds to pay for luxury items and extravagant travel, including a Mercedes Benz luxury car that he bragged about to others.

This conduct was not accidental; it was painstakingly premeditated and planned to maximize illicit profits and to avoid detection. In particular, the defendant did not simply run up a large bill unexpectedly. The defendant was notified time and again of his increasing costs, and instead of stopping the scheme and attempting to right his wrongs, he instead doubled down and

10

continued his illegal conduct at every opportunity. For example, on July 2, 2021, the defendant received his June bill from Company-1 for $955,925. Seeing this amount, the defendant did not stop; he persisted. On August 3, 2021, the defendant received his July bill from Company-1 for $1,410,252. Again, he persisted in his scheme. He ran up an additional $225,521 in Company-1's services in August. Similarly, the defendant incurred over $100,000 in Company-2's services in January 2021 and received an invoice in early February reflecting this. He proceeded to use nearly $400,000 in Company-2's services in February. On March 4, 2021, Company-2 disabled the accounts the defendant used in January and February. Just days later, on March 8, 2021, the defendant created new accounts with Company-2 that he used to steal hundreds of thousands more in services from Company-2 in March, April and May 2021.

Moreover, the defendant's conduct was born of greed and not of need. The defendant reported to Probation that he holds certifications in engineering from the Massachusetts Institute of Technology and the University of Michigan, and either degrees or credits from Iowa State University, the Cleveland Institute of Electronics and Western Governors University. *See* PSR ¶ 77. He further represented that he had earned "61 certifications in the field of information technology." *Id.* at 78. Moreover, as noted in the PSR, the defendant's LinkedIn reflects employment history as a media producer at Nike, a technology instructor at Creighton University, a mobile application developer at Samsung Electronics, a web application developer at TD Ameritrade, and Chief Engineer at Iowa State University. *Id.* at 85. With such a breadth of credentials in the information technology space, the defendant could have put his skills to use in any number of lawful and productive pursuits that would have provided him steady income and security. But that path did not interest the defendant. He instead sought to skip the hard work of making an honest living and go straight to achieving wealth and internet fame by cheating and stealing. The defendant wanted to become a "multimillionaire" at any cost, and he sought to profit off of others who strove for the same. But like so many other would-be influencers who sell get-rich-quick advice to the vulnerable, it was all based on lies.

The defendant caused significant losses to the Victim Companies and put the safety and security of their cloud computing platforms at risk. He also victimized all those who followed his social media seeking legitimate career advice and life lessons. He victimized individuals who appeared in the advice videos with him. He victimized the small business loan provider who lent him funds based on bank accounts inflated with illegal profits. He victimized the banks and payment providers he used to launder and structure his fraudulent proceeds, jeopardizing their platforms and exposing them to legal risks. And he victimized all those who work hard in the name of legitimate innovation in new spaces like blockchain technology and digital assets, by eroding public trust in those spaces.

The defendant's arguments for a downward departure or variance from the sentencing Guidelines are unavailing. In particular, the defendant's critique of U.S.S.G. § 2B1.1's reliance on loss amount to calculate the applicable offense level should be rejected, as here the offense level appropriately captures the seriousness of the crime. *See* Defendant's Sentencing Memorandum at 7-9, ECF No. 38 ("Def. Mem."). The government recognizes that courts have criticized U.S.S.G. § 2B1.1 for its heavy reliance on the amount of loss in arriving at an offense level. *See, e.g.*, *United States v. Johnson*, No. 16-CR-457 (NGG), 2018 WL 1997975, at *1 (E.D.N.Y. Apr. 27, 2018). As the Second Circuit explained, "[w]here the commission has assigned

11

a rather low base offense level to a crime and then increased it significantly by a loss enhancement," as in U.S.S.G. § 2B1.1, "that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016).

However, the government respectfully submits that the Guidelines range here does not overstate the defendant's culpability, the moral seriousness of his crime, or the need for deterrence. This case is not one, for example, where loss calculation is premised on stock price fluctuations in a publicly traded company, in which any fraud can lead to monumental loss. *See United States v. Parris*, 573 F. Supp. 2d 744, 747 (E.D.N.Y. 2008); *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (noting that the "precipitous decline in stock price that typically accompanies a revelation of fraud generates a multiplier effect that may lead to guideline offense levels that are, quite literally, off the chart"), *aff'd*, 301 F. App'x 93 (2d Cir. 2008).[5] Nor is it a case where the consequent profits were enjoyed by individuals far removed from the defendant. *See Johnson*, 2018 WL 1997975, at *3.

Instead, the loss figure here is tied directly to the defendant's actions to benefit himself and the foreseeable consequences of those actions. He personally enjoyed the profits of his fraud, buying luxury items and taking extravagant vacations. In deceiving the Victim Companies, he callously represented that he was building an educational institution that would provide training to thousands of students. (Congress has determined that lying about acting on behalf of a charitable or educational institution is especially reprehensible and has established a Guidelines enhancement to address such conduct. As noted in the PSR, *see* ¶ 20 n.1, such an enhancement was considered but not pursued here due to a technicality; nevertheless, it is serious all the same and the Court can and should consider it.) Moreover, the defendant's conduct goes far beyond the initial fraud. After deceiving the Victim Companies and profiting from his lies, he meticulously moved the fraudulent proceeds around from account to account to avoid detection, even going so far as to structure his money movements to evade reporting requirements. That additional conduct gave rise to several additional and independent charges on top of the wire fraud count to which he pled. His conduct from beginning to end demonstrates a significant level of guilt that is not already baked into his Guidelines calculation. Indeed, focusing on loss alone can fail to account for "the moral seriousness of the offense or the need for deterrence" in both directions. *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.).

---

[5] Similarly, U.S.S.G. § 2B1.1 Application Note 21(C) provides that "[t]here may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." The note further states: "For example, a securities fraud involving a fraudulent statement made publicly to the market may produce an aggregate loss amount that is substantial but diffuse, with relatively small loss amounts suffered by a relatively large number of victims. In such a case, the loss table in subsection (b)(1) and the victims table in subsection (b)(2) may combine to produce an offense level that substantially overstates the seriousness of the offense. If so, a downward departure may be warranted." *Id.* That note contemplates a circumstance not present here: the losses here were not small or insignificant losses spread across a large, anonymous population of market participants; they were impactful losses borne by just two Victim Companies directly targeted by the defendant and their losses directly resulted from the amount of services he stole from each.

12

To the extent it can be argued that the Guidelines overemphasize loss as a factor, it can also be argued that they underemphasize factors like culpability, character and overall conduct. *Id.* at 427-28. Those factors weigh heavily against the defendant for the reasons discussed above, countering any variance that could be considered due to loss enhancements under U.S.S.G. § 2B1.1.

Nor, despite the defendant's assertions, would a Guidelines sentence create a sentencing disparity in light of the national averages. According to the U.S. Sentencing Commission's Judiciary Sentencing Information site ("JSIN"), "[d]uring the last five fiscal years (FY2020-2024), there were 457 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 22 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure." *See* U.S. Sentencing Commission JSIN, *https://jsin.ussc.gov/analytics/saw.dll?dashboard* (last accessed June 6, 2025). Of those, 96% (441 defendants) "received a sentence of imprisonment in whole or in part." *Id.* For those 441 defendants, the average length of imprisonment imposed was 33 months and the median length of imprisonment imposed was 35 months. *Id.* A sentence of probation here would be an extreme outlier on par with just a handful—4%—of like defendants over the past five years.

A significant sentence here is crucial for deterrence. Indeed, "[t]he need for general deterrence is particularly acute in the context of white-collar crime." *Johnson*, 2018 WL 1997975, at *5. This is true, in part, because "[p]ersons who commit white-collar crimes like [the] defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed." *Id.* at *5; *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it.").

It is vital here to impose a significant sentence to deter similar frauds by other sophisticated actors who believe that their crimes will be too complicated or abstract to detect and punish. The Court should not send a message to a generation of get-rich-quick crypto influencers that there is a way to essentially print money by stealing from others with no consequences.

VII.    Conclusion

        For the foregoing reasons, the government respectfully requests that the Court impose a sentence at the high end of the applicable Guidelines range of 41 to 51 months' imprisonment.

                                      Respectfully submitted,

                                      JOSEPH NOCELLA, JR.
                                      United States Attorney

By:    /s/
                                      Andrew D. Reich
                                      Assistant U.S. Attorney
                                      (718) 254-7000

cc:    Clerk of Court (EK) (By ECF and Email)
       Counsel of Record (By ECF and Email)
       United States Probation Officer (By Email)