**Federal Defenders**
OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Fl., Brooklyn, NY
11201 Tel: (718) 330-1200  Fax: (718) 855-0760

Tamara L. Giwa
*Executive Director and
Attorney-in-Chief*

Michelle A. Gelernt
*Attorney-in-Charge*

July 18, 2025

By ECF and Email
The Honorable Eric Komitee
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

          Re:   *United States v. Charles O. Parks III*, 24-cr-105 (EK)

Dear Judge Komitee:

      As directed by the Court during the June 26, 2025 sentencing that was subsequently adjourned to August 15, 2025, we write to set forth in more detail the defense's position on the loss amount in this case.

      At the outset, we want to make one thing clear. Mr. Parks takes responsibility for his offense and does not dispute that he owes Amazon and Microsoft for their cloud computing services. Rather, the defense's dispute is with the amount the government claims he owes. Despite the government's claims to the contrary, Mr. Parks has never been provided with detailed invoices or other information that fully demonstrates how his usage of Amazon's and Microsoft's cloud computing services added up to the amounts he was billed.

      As discussed further below, the government cannot meet its burden of establishing the more than $3.5 million in loss it claims is attributable to Mr. Parks. Because the loss amount is both impracticable to determine and inadequately measures the harm to Amazon and Microsoft, the Court should instead use the gain that resulted from the offense. The defense submits that a reasonable estimate of that gain is $500,000, the amount the parties stipulated that Mr. Parks would forfeit as a result of his offense. The defense also made this argument in its Objections to the Presentence Investigation Report; those objections are attached to this letter and incorporated herein by reference.

      If the Court does not believe the gain is the appropriate measure in this case, it should find that the absolute maximum loss calculation for Amazon is $1,312,397.36. This represents the total amount Amazon billed Mr. Parks during the period of the indictment (less a small charge for customer support), but billed at Amazon's Spot Pricing rate, which is the minimum

billable retail price Amazon offered for the instances at issue here. The Court should further find that the absolute maximum loss calculation for Microsoft is $578,018.05, which represents the total amount Microsoft billed Mr. Parks, less the amounts Microsoft later credited back to his account.

## I. LEGAL STANDARD

U.S.S.G. § 2B1.1, which covers fraud offenses, applies a low base offense level of either 6 or 7, depending on the offense of conviction. U.S.S.G. § 2B1.1(a). The guideline then provides for an increase to that base offense level based on the amount of loss. *Id*. § 2B1.1(b)(1). The Guidelines define loss as "the greater of actual loss or intended loss." *Id*., note (A). "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense," while "intended loss" is defined as that pecuniary harm "that the defendant purposely sought to inflict." *Id*., note (C)(i) and (C)(ii).

Loss estimates must be based on available information, considering various factors that are "appropriate and practicable under the circumstances." U.S.S.G. § 2B1.1, Comment n.3(B). Courts may consider "[t]he fair market value of the property unlawfully taken, copied, or destroyed." *Id*. § 2B1.1, Comment n.3(B)(i). However, "if the fair market value is impracticable to determine or inadequately measures the harm, the cost to the victim of replacing that property" may be considered instead. *Id*.; *see also United States v. Villa*, 744 F. App'x 716, 720–21 (2d Cir. 2018); *United States v. Lige*, 635 F.3d 668, 672 (5th Cir. 2011); *United States v. Howard*, 887 F.3d 1072, 1077 & n.1 (10th Cir. 2018) (collecting cases using replacement value as proper measure in the context of determining loss). And if the court cannot reasonably determine the loss at all, it "shall use the gain that resulted from the offense" instead. U.S.S.G. § 2B1.1(b)(1), note (B).

## II. ARGUMENT

### A. The Court should use the gain that resulted from the offense because the loss cannot be reasonably determined

Because the government has not (and cannot) meet its burden of proving the amount of loss, the Court should find that the loss cannot be reasonably determined based upon the information available and should use the financial gain that resulted instead. *See* U.S.S.G. § 2B1.1(b)(1), note (B). Here, after lengthy negotiation, the parties have agreed that a reasonable estimate of the amount Mr. Parks gained as a result of the offense is $500,000, which is what he has agreed to forfeit. *See* Plea Agreement ¶ 6. Using $500,000 as the loss amount results in 12 levels being added to the base offense level. *See* U.S.S.G. § 2B1.1(b)(1)(G) (more than $250,000 but less than $550,000). This would result in a total offense level of 16 and a Criminal History Category of I, which leads to an advisory Guideline range of 21-27 months.

> B. **If the Court does not use the gain that resulted, it should find that the loss, if proven, cannot exceed $1,312,397.36 for Amazon and $578,018.05 for Microsoft**

Although the government has failed to support its loss calculation, assuming Amazon and Microsoft provided the supporting documentation outlined below, the maximum provable loss based on spot instance pricing in this case is as follows:[1]

Amazon Maximum Loss: $1,312,397.36
Microsoft Maximum Loss: $578,018.05
Total Maximum Loss: $1,890,415.41

For both Amazon Web Services ("AWS") and Microsoft Azure, loss for each computing instance can only be proven with certain necessary documentation:

- Start Date / Time
- End Date / Time
- Instance Type
- Instance Operating System (should always be a free Linux variant)
- Instance Region
- Billing Rate, per hour
- Billing Type
- Service Limit Request Date / Time
- Service Limit Request vCPUs Requested
- Service Limit Request Approval Date / Time
- Service Limit Request vCPUs Approved

All 11 of these components are absolute requirements to bill / invoice an instance. Using the Court's "hat" analogy from the June 26 sentencing hearing, the 11 necessary billing components are defined as follows:

- Amazon and Microsoft are both manufacturers and renters of the "hats." Here, a "hat" is a computing instance.
- The Start Date/Time and End Date/Time is the time period a customer rents a specific "hat."
- The Instance Type is the size of the "hat" (i.e. hardware).
- The Instance Operating System should always be the same (Ubuntu Linux), regardless of the instance type.
- The Instance Region is where the "hat" is rented geographically.
- The Billing Rate is how much, given the above characteristics, a "hat" is rented for at a particular moment in time.
- The Billing Type is either:

---

[1] Spot instances allow a user to take advantage of unused capacity in the AWS cloud and are available at a discount compared to On-Demand prices. See https://aws.amazon.com/ec2/spot/.

3

> (1) On-Demand – An instance type that can be rented for an unlimited period of time at full retail price; or
>
> (2) Spot – An instance type that can be rented for up to 24 hours at a discounted price, but its rental can be interrupted to accommodate On-Demand capacity.

- The Service Limit Request Date / Time is the moment Mr. Parks asked to increase how many instances he could rent at a time for a specified Instance Type and Region.
- The Service Limit Request vCPUs (virtual central processing unit) Requested are how many instances Mr. Parks requested to be able to rent at a time.
- The Service Limit Request Approval Date / Time is the moment Amazon and Microsoft approved the number of instances that could be rented at a time for a specified Instance Type and Region.
- The Service Limit Request vCPUs Approved are how many instances Mr. Parks was approved to rent at a time.

The four Service Limit Request components are distinct from the seven other billing components, but to adequately calculate los the service limit information must at a minimum contain the Instance Type and Instance Region per Service Limit Request. A data analyst would need to join that data together using the Dates/Times.

None of the 11 components can be omitted. Without one of these categories of information, it is impossible to accurately calculate the loss for that billable "hat" (instance). In addition to these 11 components, the government would also have to show that none of the instances Mr. Parks was running were outside the scope of the service limit increases he requested and received (i.e. that they resulted from the fraudulent misrepresentations in his service limit increase requests).

In accordance with U.S.S.G. § 2B1.1(b)(1)(I), assuming that Amazon and Microsoft provided the necessary components to justify their billing for each computing instance (which, as of this writing, they have not), the maximum enhancement that could be applied using this Maximum Loss Calculation Method would be +16 instead of the PSR's recommendation of +18.

1. <u>Amazon Loss Calculation</u>

Based on the discovery produced in the case, *see* PARKS – 002682, our Maximum Loss Calculation Method uses a one month rolling average of the equivalent Spot Pricing (as opposed to the marked up On-Demand Pricing), because it represents the minimum billable retail price for a customer to rent each instance, and because Spot Pricing is more stable and standardized

4

over time.[2] The Information Sciences Institute ("ISI") has created a data collection tool that has captured Amazon's EC2 Spot Pricing since 2014. *See* https://ant.isi.edu/~calvin/data/ec2-spot-price/.

In the Existing Spot Rate column, for each Usage Unit containing the phrase "SpotUsage," we divided the Charge Local cost column by the Usage Total time column (in hours) to get the billed Spot pricing. *See* Exhibit B2.

In the Spot Rolling 1 Month Average Rate (ISI) cost column, we took the average Spot pricing from the ISI Dataset for the entire calendar month of each Billing Date, Region, and the Instance Type defined in the Usage Unit column.

In the Spot Adjusted Total Charge cost column, we multiplied the Usage Total time column by the Spot Rolling 1 Month Average Rate (ISI) cost column.

In the Spot Adjusted Difference cost column, we subtracted the Spot Adjusted Total Charge cost column from the Charge Local cost column.

For the sake of consistency, we did not exclude any lines where the Spot Adjusted Difference cost column was negative, meaning that we did not give Mr. Parks the benefit of any instances where Mr. Parks was billed less than the equivalent Spot pricing rate.

Based on the foregoing, the Maximum Loss Calculation for Amazon is:

$2,591,637.26 in the "AWS Billing" tab in PARKS – 005252
- $1,183,205.94 (Total Spot-Adjusted Difference)
- $ 96,033.96 (AWS Support (Business))

This yields a total maximum loss to Amazon of $1,312,397.36.

Although this calculation is the maximum loss based on the government's proffer of Amazon's billing, it continues to be unsupported by proper documentation. There are also several additional reasons to doubt this maximum figure, based on PARKS – 002682.

First, the AWS Billing Records contain fifteen instances of a service named "AWS Support (Business)" totaling $96,033.96, without any justification. *See* Relevant Data in Exhibit B1. Mr. Parks was billed for the service four times in June, four times in July plus a fee, and four times in August. But based on our investigation, AWS never provided any support to Mr. Parks to justify this billing (there was no cost associated with making Service Limit Requests); therefore, no loss for this service occurred.

Second, in PARKS – 002682, there are 281 line items for a service called "Amazon

---

[2] For example, the Instance Type and Instance Operating System of a p4d.24xlarge is the exact same in every region, regardless of whether the Usage Units are "BoxUsage," "HeavyUsage," or "SpotUsage."

Elastic Compute Cloud" which were unpaid (with Billing Dates of 6/1/2021, 7/1/2021, and 8/1/2021). *See* Relevant Data in Exhibit B2. Amazon does not explain the nature of these charges, or how they calculated the total amounts.

Third, there are numerous instances of duplicate billing—throughout the Usage Unit column there are multiple lines of billing for that same Usage Unit, without any justification. For example, on the Billing Date of 8/1/2021, Mr. Parks was billed twice for "BoxUsage:g4dn.xlarge," and nine times for "SpotUssage:g4dn.xlarge."

Fourth, the individual instances remain undefined in the AWS-related discovery. The only place the individual instances are partially defined is in PARKS – 005252 (in the EC2 Launch Data tabs). But there is no correlation between PARKS – 002682 and PARKS – 005252. Only three of the necessary billing components (Start Date / Time, Instance Region, and Instance Type) are defined in PARKS – 005252.

### 2. Microsoft Loss Calculation

Microsoft's Victim Impact Submission includes six exhibits that show the total billed amount for each of fifty three invoices.[3] However, none of the exhibits include any justification for how those amounts were calculated, including at most three line items (compute, storage, and networking).[4] It is impossible from the materials provided to identify any of the instance or usage, and instance pricing. Microsoft's exhibits also appear to include billing errors. For example, Microsoft incorrectly references a non-existent Invoice # F003485239—the correct invoice, to the best of our knowledge, is #G003485239. Microsoft also fails to credit certain paid invoices. Invoice # G003449766, dated February 10th, 2021 in the amount of $323.77, was omitted from the Victim Impact Submission.

Microsoft's Victim Impact Submission lists Invoice #G003251795 as an invoice "Written Off For Nonpayment." However, Exhibit C6 (PARKS – 004822) shows that payment was made via Wire Transfer on March 23, 2021. In discovery, an email entitled "106577187_Microsoft Online Services – Final Warning" dated "Mon, Aug 2, 2021 at 1:38 PM" addressed to "charles@cp3o.com" from "Microsoft Online GFS - NA <wocs-na@microsoft.com>," *see* Exhibit C7, shows a Credit Invoice # G005006497 dated July 14, 2021 in the same exact amount as Invoice #G003251795. Within that same e-mail, it states, "You have a credit amounting to -8,285.17 USD. May we know where to apply this credit."

---

[3] A total of forty-eight Invoice Notifications (not invoices) were provided in discovery. *See* PARKS – 002801. Another five Invoice Notifications were located through defense investigation after receipt of the Victim Impact Submission.

[4] Because the bare bones "compute" line items in the five Microsoft invoices do not contain spot instance rates, it is impossible for the Court to use spot instance pricing as an approximation for Microsoft's loss. Moreover, there is no database like ISI, *see supra* at 5, to determine historical Microsoft spot pricing. For this reason, unlike with Amazon, we are unable to provide a spot pricing loss calculation. If we did have the same line item spot instance data for Microsoft, the Maximum Loss Calculation would be less than $578,018.05.

Similarly, in the same email, there is another credit invoice #G004720016 dated June 25, 2021 in the amount of $5,380.61. Although there aren't any invoices listed in the Victim Impact Submission for that exact amount, this credit should have been applied to the combination of invoices that could have been paid in full with that credit; namely, invoice #G003504139 for $2,924.77, and invoice #G003999180 for $2,401.63, still leaving an available unapplied credit of $54.21.

In discovery, five emails entitled "Your credit balance(s) has been applied to your Microsoft Cloud Account" to "charles@cp3o.com" from "WOCS- NA@microsoft.com" show the following 25 Credit Invoices:

- Credit Invoice # G004721093 applied to invoice # G003302791 in the amount of US$ 12,645.30 (see Exhibit C9)
- Credit Invoice # G004721067 applied to invoice # G003307561 in the amount of US$ 8,836.40 (see Exhibit C9)
- Credit Invoice # G004721065 applied to invoice # G003308951 in the amount of US$ 13,769.32 (see Exhibit C9)
- Credit Invoice # G004721115 applied to invoice # G003313026 in the amount of US$ 12,267.61 (see Exhibit C9)
- Credit Invoice # G004721179 applied to invoice # G003337196 in the amount of US$ 16,679.78 (see Exhibit C10-1)
- Credit Invoice # G004721266 applied to invoice # G003362079 in the amount of US$ 18,280.68 (see Exhibit C10-1)
- Credit Invoice # G004721364 applied to invoice # G003393441 in the amount of US$ 15,437.15 (see Exhibit C10-1)
- Credit Invoice # G004721379 applied to invoice # G003407188 in the amount of US$ 686.00 (see Exhibit C10-1)
- Credit Invoice # G004720158 applied to invoice # G003428133 in the amount of US$ 11,610.87 (see Exhibit C9)
- Credit Invoice # G004721460 applied to invoice # G003431856 in the amount of US$ 4,837.07 (see Exhibit C10-1)
- Credit Invoice # G004719962 applied to invoice # G003485239 in the amount of US$ 22,346.56 (see Exhibit C8)
- Credit Invoice # G004719246 applied to invoice # G003495631 in the amount of US$ 21,357.09 (see Exhibit C10-2)
- Credit Invoice # G004719302 applied to invoice # G003499161 in the amount of US$ 27,279.43 (see Exhibit C8)
- Credit Invoice # G004720184 applied to invoice # G003499339 in the amount of US$ 21,278.74 (see Exhibit C10-1)
- Credit Invoice # G004722267 applied to invoice # G003500146 in the amount of US$ 25,939.28 (see Exhibit C8)
- Credit Invoice # G005338244 applied to invoice # G003563850 in the amount of US$ 24,413.34 (see Exhibit C11)
- Credit Invoice # G004719499 applied to invoice # G003614725 in the amount of US$ 6,025.75 (see Exhibit C9)

- Credit Invoice # G004718196 applied to invoice # G003626277 in the amount of US$ 26,110.66 (see Exhibit C8)
- Credit Invoice # G004719227 applied to invoice # G003670196 in the amount of US$ 28,472.71 (see Exhibit C8)
- Credit Invoice # G004719278 applied to invoice # G003675666 in the amount of US$ 27,448.36 (see Exhibit C8)
- Credit Invoice # G004719666 applied to invoice # G003685083 in the amount of US$ 4,977.67 (see Exhibit C9)
- Credit Invoice # G004722305 applied to invoice # G003449773 in the amount of US$ 14,219.59 (see Exhibit C9)
- Credit Invoice # G004720016 not applied to any invoice in the amount of US$ 11,334.91 (see Exhibit C10-1)
- Credit Invoice # G005338037 not applied to any invoice in the amount of US$ 2,302.81 (see Exhibit C12)
- Credit Invoice # G005338328 not applied to any invoice in the amount of US$ 16,061.35 (see Exhibit C12)

Each of those five Applied Credit Balance emails state: "FYI: Your credit balance(s) has been applied" and "Please note that we have not received posting instructions for credits related to Charles." The credits from these five emails total $394,618.43. The Microsoft billing discrepancies offer significant reason for doubt in accurately calculating the loss. As with Amazon, though, we provide a Maximum Loss Calculation for Microsoft, although the actual loss is likely far lower. The Maximum Loss Calculation for Microsoft is:

  $ 980,921.65 from the Microsoft Victim Impact Submission
  - $402,903.60 from all Credit Invoices located in PARKS – 002801

This yields a total maximum loss to Microsoft of $578,018.05.

  Thank you for your consideration of this letter.

Respectfully Submitted,

/s/
Jeffrey S. Dahlberg
Samuel Jacobson
Counsel to Charles O. Parks III
Federal Defenders of New York Inc.

cc: AUSA Andrew Reich (via ECF)
   USPO Jeremy Toner